STEPHANIE YONEKURA
Acting United States Attorney
ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. State Bar No.: 242101)
Public Corruption & Civil Rights Section
CAMERON L. SCHROEDER (Cal. State Bar No.: 255016)
Deputy Chief, General Crimes Section
Assistant United States Attorneys
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-2091/0596
    Facsimile: (213) 894-6436
    E-mail:  mack.jenkins@usdoj.gov
           cameron.schroeder@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       Plaintiff,<br><br>          v.<br><br>LUIS MANUEL TAPIA,<br><br>       Defendant. | No. CR 11-1068-ODW-1<br><br>TRIAL MEMORANDUM<br><br>Trial Date:  September 2, 2014<br>Time:       9:00 a.m.<br>Location:   Courtroom of the<br>           Hon. Otis D. Wright<br>           II |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys Mack E. Jenkins and Cameron L. Schroeder, hereby submits its Trial Memorandum.

Dated: August 26, 2014

Respectfully submitted,

STEPHANIE YONEKURA
Acting United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division


_____/s/_____
MACK E. JENKINS
CAMERON L. SCHROEDER
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

2

# I.    STATUS OF THE CASE

## A.    Procedural Background

Defendant Luis Manuel Tapia, also known as ("aka") "Taps," aka "Bizee" ("defendant"), is the lead defendant and charged in a 28-count indictment.[1]   Defendant is named in 26 of the 28 counts.   The indictment charges defendant with violations of the following statutes: 21 U.S.C. §§ 848(a),(b),(s): Leading a Continuing Criminal Enterprise that Distributed At Least 1,000 Grams of Methamphetamine (Count 29); 21 U.S.C. § 846: Conspiracy to Possess with Intent to Distribute and to Distribute Controlled Substances (Count 1); 18 U.S.C. § 371: Conspiracy to Engage in the Business of Dealing in Firearms without a License (Count 2); 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(i), (b)(1)(A)(viii), (b)(1)(B)(viii), (b)(1)(C): Possession with Intent to Distribute and Distribution of Heroin, Methamphetamine, and Cocaine (Counts 3,4, 6-10, 14, 19-20); 18 U.S.C. § 924(c)(1)(A): Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Counts 11, 23, 25); 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm (Counts 12, 13, 15, 16, 18, 24, 26); and 26 U.S.C. § 5861(e): Illegal Transfer of a Machinegun (Count 17). These violations arise out of defendant's course of conduct over an extended period of time in which defendant: discussed selling, conspired to sell, and actually sold substantial amounts of methamphetamine, heroin, and cocaine, including multiple sales to a Confidential Human Source (CHS); possessed other amounts of these drugs in distribution quantities; sold numerous firearms to the CHS,

---

[1] There are 29 counts in the filed version of the indictment; however, due to an editing error counts 27 and 28 are duplicates. Count 28 will be stricken from the trial indictment and defendant's special verdict form.

including a machinegun and several assault rifles; and possessed firearms as a felon and in furtherance of his drug trafficking conduct.

**B.    Preliminary Matters**

1.   <u>Trial Estimate</u>

The government currently estimates that the government's case-in-chief, including cross-examination, will last approximately five court days.  The government expects to call approximately 13 witnesses in its case-in-in-chief.  In order to efficiently and coherently present the case in a chronological order, the government seeks leave to call the then lead case agent, FBI SA Michael Easter, two times, as the sixth and tenth witness in the government's case. The government seeks to recall SA Easter because he is the most competent witness to testify about each of the events on certain dates but having him do so all in one sitting would mean introducing these events out of order.  Such testimony would be unnecessarily confusing for the jury and would force later witnesses to have to extend their own testimony to explain the context and timing of their events relative to the events SA Easter testified about but had not yet actually happened in the timeline of the case.

Defendant estimated his case-in-chief should last no longer than one day.  Defendant has not provided the Court or the government a witness list or exhibit list, but the government would reserve the right to call rebuttal witnesses should defendant present a case.

2.   <u>Expert Notice</u>

The government timely provided notice that Oxnard Police Department ("OPD") Officer Jeff Long would briefly testify as a gang expert, namely an expert on defendant's gang, the Colonia Chiques.

2

The government timely provided notice that ATF Senior SA David Hamilton would testify as a firearms and interstate nexus expert. Finally, the government timely provided notice that a California Department of Corrects and Rehabilitation ("CDCR") SA would briefly testify as an expert on the Mexican Mafia and the CDCR validation process.[2]

The government also noticed that the case agents, FBI SA Michael Easter and TFO Richard Marquez, based on their personal observations and knowledge of the investigation, would testify regarding their understandings of recordings played for the jury.  The government asserts that this is lay, not expert, testimony[3] but provided notice to the defense of such testimony in an abundance of caution.

### 3.   Stipulations

The parties have filed a stipulation to admit the type, quantity, and purity of the drugs seized in this matter (Stipulation #1; Clerk's Record ("CR") 266).  The government will seek to read the stipulation, display it for the jury, and enter into evidence as Exhibit 408.

The parties have tentatively agreed to stipulate that defendant was a felon who had been convicted of an unmentioned crime prior to March 2011 (Stipulation #2).  Once formally signed, the government will seek to read the stipulation, display it for the jury, and enter into evidence as Exhibit 427.

---

[2] The government originally noticed CDCR SA John Castanedo for this role but, because of a recent work-related surgery for SA Castanedo, the government informed the defense that SA Castanedo's partner, SA Guillermo Moreno, would now testify in this role.

[3] United States v. Gadson, 2014 U.S. App. LEXIS 15969, 2014 WL 4067203 (9th Cir. Alaska Aug. 19, 2014). See discussion in Section IV(B), below.

### 4.   Witness/Jenks Statements

The government has timely provided all witness statements for the witnesses that the government intends to call in the government's case-in-chief.  Per the Court's Criminal Trial Order (CR 138), on August 26, 2014, the government filed in camera witness statements for the Court.  The government has requested, but not yet received, any witness statements from defendant.

### 5.   Motions in Limine

There are no pending motions in limine.  Defendant filed various motions in limine seeking to preclude testimony and evidence on various topics, mainly defendant's own incriminating statements and reference to firearms.  (CR 216, 217.)  Defendant also sought to exclude each of the government experts.  The Court denied every part of defendant's various motions with the exception that the government will not introduce defendant's own statement where he discussed burning down a police station.  (CR 246.)  The government filed one motion in limine, which also was a motion to quash defendant's attempt to call CHS-1 as a defendant witness (CR 228).  The Court granted the government's request to quash defendant's subpoena and otherwise preclude the testimony of CHS-1 as irrelevant and evocative of ulterior motives.  (CR 246.)  Moreover, at a later hearing, the Court found there were significant safety and logistical concerns with ordering a government informant to testify at defendant's trial.

### 6.   Presentation of Evidence

The government intends to use the Sanctions Litigation program in order to display evidence via the in-Court monitors.  Such evidence will include photographs, video, and audio recordings.  The government has prepared transcripts for most of its audio exhibits.

4

The government intends to provide the Court, each juror, and defendant with a transcript binder at the start of trial.  In addition, the same transcripts will be displayed on the monitors synced with the playing audio.  The transcripts will also be authenticated by a competent government witness.  The government has provided defendant almost all of the current transcripts it intends to present at trial.  The government has received no objections to its proposed transcripts.

Because of the voluminous amount of exhibits, recordings, and various transcripts that will be utilized in this trial to present this lengthy investigation to the jury, the government seeks leave to have both case agents SA Easter and TFO Marquez at counsel table throughout trial in order to expedite the presentation.

       7.   Defenses

Defendant has noticed no defenses.

## II.   ELEMENTS OF THE CHARGED OFFENSES

The elements of the crimes are set forth in the Joint Proposed Jury Instructions, filed August 28, 2014 (CR 267).

## III. STATEMENT OF FACTS

### A.   The Origin of the Investigation into Defendant

For over the last decade, defendant has been known to Ventura County law enforcement as an influential member/leader of the Colonia Chiques street gang and a validated member of the Mexican Mafia. Various sources of intelligence have indicated that defendant was involved in significant street violence, including murder and attempted murder, monopolizing the drug trade in parts of Ventura County, particularly heroin, methamphetamine, and cocaine, and communicating with significant Mexican Members, such as Michael "Boo

Boo" Moreno and Michael "Mosca" Torres, who had significant influence over territories in which defendant operated.  Accordingly, Ventura County Federal Violent Crimes Task Force consisting of members of the FBI and OPD (the "Task Force") began an investigation seeking to infiltrate and dismantle defendant's criminal enterprise and remove him from his role as a leading criminal figurehead in Ventura County.

**B.    Summary of Case Against Defendant**

The government's proof in this case will consist largely of recorded conversations and meetings with defendant, the testimony of the case agents, the testimony of a few additional percipient law enforcement witnesses, all supported by limited expert testimony. Each of the charged transactions, whether for guns or drugs, was recorded – in many cases, on video. The government will not need to rely on the testimony of the CHSs involved in the transactions,[4] but will let defendant's words and actions speak for themselves.

With regard to the charged criminal enterprise, it is the government's theory that defendant was able to occupy, and did occupy, his position of leadership in the enterprise as a direct corollary to his leadership position within the Colonia Chiques street gang ("COCH gang").  In other words, it was defendant's gang leadership that acted as a critical part of (1) his ability to lead the charged criminal enterprise and drug trafficking operation ("DTO"); (2) his influence over other members of this enterprise; and (3) his source of criminal assets, which included drugs, firearms, trapped vehicles, and subservient junior members of his gang.  Expert testimony will establish that: this gang, like almost all Sureño

---

[4] CHS-2 died from cancer not long after the investigation concluded.

gangs, obtains its power in part from its affiliation with the Mexican Mafia prison gang; the COCH gang is one of the largest and most violent street gangs in Ventura county; and defendant is one of its most notorious and respected members.

Tattoos on defendant's body, which have indicated his membership in the COCH gang since at least 2000, include "COxCH" in large letters on his chest; several Aztec images (used by Mexican Mafia members and associates) on his shoulders; and another Colonia Chiques tattoo on the back of his head.  A government expert will testify that all of these images indicate membership in the gang.  An expert will further testify that defendant has been by validated by the CDCR's official validation process, which identified defendant as a confirmed associate of the Mexican Mafia in 2001.  The expert is also expected to explain that authority of the gang – and the Mexican Mafia – is required to deal drugs in Ventura County, particularly in the quantities defendant sold and possessed in this investigation – which again overlaps with and provides context for the necessary elements to sustain the CCE conviction.  An expert will also give context to several key pieces of evidence in this case, including statements by defendant that he worked for a criminal organization that operated from prison, defendant's references to other individuals working with or for him, and a recording of a nighttime meeting of COCH gang members where defendant was the keynote speaker.

Four of defendant's co-defendants (Zamora, Aguilar, Armendariz, and Cardenas) have pled guilty to conspiring with defendant to traffic contraband.  Co-defendant "Pancho" remains a fugitive from justice.

1
     **C.**    **The Timeline:**

2
     CHS-1, a former close gang ally of defendant's, met with

3
defendant on several occasions to discuss defendant's drug

4
trafficking business, gang business, and other related matters.

5
Defendant was often accompanied by gang members/associates that

6
worked for him and assisted him with such things as transportation,

7
security, and to provide him an escort.  Early in the case, CHS-1

8
introduced CHS-2, who posed as a firearms and drug trafficker with

9
connections to the Italian mob in Las Vegas.  After that point,

10
defendant dealt directly with CHS-2 and CHS-1 played essentially no

11
further role in the investigation.  Towards the end of the

12
investigation, CHS-2 introduced defendant and key members of his

13
enterprise to an FBI undercover agent (the "UC"), who was posing as

14
CHS-2's Las Vegas mob boss.

15
     In addition, there was a search warrant executed on one of

16
defendant's vehicles driven by co-defendant Zamora and which vehicle

17
was found to contain a treasure trove of evidence in hidden traps.

18
There was another stop and seizure of a separate vehicle driven by

19
co-defendant Aguilar and which was found to contain a large quantity

20
of drugs.  Finally, upon defendant's arrest after a significant sale

21
of methamphetamine to CHS-2 and the UC, search warrants were executed

22
at defendant's parents' house (where defendant had stated he stashed

23
guns), defendant's house, and another of defendant's vehicles, which

24
contained more hidden traps and another treasure trove of evidence.

25
Upon his arrest, defendant declined to give a statement.

26

27
     Below is a non-exhaustive timeline of significant events for

28
which the government intends to present evidence:

| DATE | PARTICIPANTS | TOPICS | EVIDENCE |
|------|-------------|--------|----------|
| 3/8/11 | TAPIA, Edgar Aguilar, CHS-1 | Drug trafficking, cartels, gang business, hidden traps | Audio recording |
| 3/18/11 | TAPIA, Roger Armendariz, CHS-1 | Drug trafficking | Audio recording |
| 3/31/11 | TAPIA, Armendariz, | Drug Trafficking, gang business; hunting informants | Audio recording |
| 4/15/11 | TAPIA, Chris Gallegos, CHS-1 | Gang business | Audio recording |
| 4/29/11 | TAPIA, Armendariz, CHS-1, CHS-2 | CHS-2 introduction; future methamphetamine and gun sales | Audio recording |
| 5/19/11 | TAPIA, CHS-2 | Methamphetamine sale; future sales of up to 15lbs of meth; TAPIA's high quality meth and competitive pricing; details of TAPIA's DTO | Video recording; 111.2 grams of meth |
| 6/8/11 | TAPIA, Melissa Dibble, CHS-1, CHS-2 | Guns and cocaine sale; details of TAPIA's DTO; future gun sales | Video recording; 2 assault rifles; 14.4g of cocaine |
| 6/14/11 | TAPIA, Cardenas, CHS-1 | Gang business, drug trafficking, attacking informants | Audio recording |
| 6/17/11 | TAPIA, Diana Zamora, CHS-2 | Meth, heroin, gun sale; future gun sales; stashing gun at parents' residence; trapped vehicles; law enforcement corruption; details of TAPIA's DTO | Video recording; assault rifle; 27.6g meth; heroin sample |

9

| DATE | PARTICIPANTS | TOPICS | EVIDENCE |
|------|--------------|--------|----------|
| 6/21/11 | Zamora, TAPIA | Traffic stop; hidden compartments | 1.1 kilos heroin; 234g meth; 496.5g cocaine; 2 handguns; ammo; $10,000 cash |
| 7/19/11 | TAPIA, Zamora, Armendariz, CHS-2 | 3-gun sale; future gun sales; recent car seizure of TAPIA's contraband (see 6/21/11 entry) | Video recording; 3 handguns |
| 8/3/11 | Aguilar, TAPIA | Traffic stop | 317.3g meth |
| 8/25/11 | TAPIA, Cardenas, Natalie Hynes, CHS-2 | 3 gun sale; TAPIA hid his weapons in various locations; TAPIA owned an AK-47; future gun sales; hunting an associate who lost TAPIA's drug money; | Video recording; 3 handguns |
| 9/8/11 | TAPIA, CHS-2 | 3 gun sale; source of TAPIA's assault rifles; the seizure of TAPIA's of car and contraband on 6/21; bringing business partners to Las Vegas meeting | Video recording; 3 handguns |
| 9/16/11 | TAPIA, Pancho, CHS-2, UC | Future 10lbs meth and 41bs cocaine deal; details of TAPIA's international DTO; tracking down TAPIA associates who lost his drug money; future larger drug sales; high-powered and automatic weapons | Video recording |
| 9/17/11 | TAPIA, Pancho, Jimenez, Hynes, CHS-2 | Future 10lbs meth and 41bs cocaine deal Tracking down TAPIA associates who lost his drug money | Video recording |

| DATE | PARTICIPANTS | TOPICS | EVIDENCE |
|------|--------------|--------|----------|
| 10/19/11 | TAPIA, CHS-2 | 2-gun sale; future 10lbs of meth and 4 pounds of cocaine deal; TAPIA's guns; future firearms sales; details of TAPIA's DTO | Video recording; AK-47 machinegun; handgun |
| 10/25/11 | TAPIA, CHS-2 | 10lbs of meth and 4lbs of cocaine deal | Video recording; 4,037g of meth |
| 10/25/11 | TAPIA | Search warrant of parents' residence | AK-47 with bayonet; sawed-off shotgun; ammo |
| 10/25/11 | TAPIA | Search warrant of TAPIA's listed residence | Gun/gang evidence |
| 10/26/11 | TAPIA, Zamora | Search of TAPIA car | 263g meth; handgun; $2,500 money orders; digital scale; six cell phones |

## IV.  EVIDENTIARY AND LEGAL ISSUES

### A.    Transcripts of Recordings

The government intends to present English transcripts of recordings that are predominantly in English but that also contain select Spanish phrases translated into English.  The Ninth Circuit has recognized that the portion of the transcript that is a translation from a foreign language into English is the evidence (rather than the recording), while the remainder of the English recording is the evidence (rather than the transcript).  United States v. Taghipour, 964 F.2d 908, 910 (9th Cir. 1992) (affirming court's instruction to the jury that recording was the evidence for the portion of the conversation that was in English while the translated transcript was the evidence for the portion of the

11

1    conversation in Farsi); see also United States v. Fuentes-Montijo, 68

2    F.3d 352, 355 (9th Cir. 1995) ("when faced with a taped conversation

3    in a language other than English and a disputed English translation

4    transcript, the usual admonition that the tape is the evidence and

5    the transcript only a guide is not only nonsensical, it has the

6    potential for harm where the jurors are bilingual").  The transcripts

7    will be authenticated by multiple witnesses, many of whom were

8    listening real-time as they were recorded, who reviewed the

9    recordings, utilizing headphones to ensure the best audio quality,

10   and who often compared two different audio sources (body wire

11   recording and video recording) to ensure premium accuracy.

12       Here, as noted above, the government will present audio

13   exhibit-transcripts in the form of simultaneously-scrolling text as

14   well as binders that the jury will possess during the trial.  The

15   government will offer the Spanish translation transcript portion of

16   that call as evidence.

## B.   Case Agent(s)' Lay Testimony Will Aid the Jury's Understanding of the Recordings

17       SA Easter and TFO Marquez will authenticate each of the

18
19   recordings (video, audio, phone calls) presented to the jury. Both

20   were present monitoring/listening to the recordings in real time.  In

21   addition, as stated above, we anticipate the case agents will provide

22   the jury with limited testimony that explains the context and the

23   case agents' understandings of select vague, ambiguous, or coded

24   phrases during the playing of these recordings.[5]  Such testimony,

25

26       _____

27       [5] For example, we expect such testimony to cover (this is a non-exhaustive list but covers the general categories):

28       a.   The coded phrases CHS-2 and defendant used to refer to firearms (e.g., "farm tools") and similar vague or coded terms to

*(footnote cont'd on next page)*

where based on the law enforcement witnesses' personal observations and direct knowledge of the investigation, falls under FRE 701 and does not qualify as expert testimony governed by FRE 702.  The Ninth Circuit just recently reaffirmed this understanding via a detailed explication in United States v. Gadson, 2014 U.S. App. LEXIS 15969, 2014 WL 4067203 (9th Cir. Alaska Aug. 19, 2014).  In Gadson, the Ninth Circuit confirmed

> In applying Rule 701 to the lay opinion testimony of law enforcement officers, we have held that an officer's interpretation of intercepted phone calls may meet Rule 701's "perception" requirement when it is an interpretation "of ambiguous conversations based upon [the officer's] direct knowledge of the investigation." United States v. Freeman, 498 F.3d 893, 904-05 (9th Cir. 2007); see also United States v. Simas, 937 F.2d 459, 464-65 (9th Cir. 1991) (finding no abuse of discretion in admitting officers' lay testimony "concerning their understanding of what [defendant] meant to convey by his vague and ambiguous statements").

2014 U.S. App. LEXIS 15969 at 33-34.[6]

---

describe drugs (e.g., "glass," "powder," "brown") and quantities (e.g., "10 and 4;" "key;" "QP"; "bird"; "brick").
    b.    The true names of co-conspirators present and referenced during the recorded transactions (e.g., "Lil Pilot," "Silent," "So Fresh," "JC").
    c.    The relevant pricing and quantity structure for heroin, methamphetamine, and cocaine in Oxnard during the relevant time periods of this investigation, including wholesale, retail, and street-level prices used by the case agents during this investigation.

    d.    The personal observation and relevance of TAPIA's use of counter surveillance, multiple phones, false names, trapped vehicles and other illicit techniques to disguise his criminal enterprise.

    [6] The majority of the circuits allow officers to provide interpretations of recorded conversations based on their knowledge of the investigation, subject to various safeguards. See United States v. Albertelli, 687 F.3d 439, 444-48 (1st Cir. 2012); United States v. El-Mezain, 664 F.3d 467, 513-14 (5th Cir. 2011); United States v. Jayyousi, 657 F.3d 1085, 1102-03 (11th Cir. 2011); United States v. Rollins, 544 F.3d 820, 830-33 (7th Cir. 2008); United States v. Garcia, 994 F.2d 1499, 1506-07 (10th Cir. 1993); United States v. De Peri, 778 F.2d 963, 977-78 (3d Cir. 1985).

1      The Court went on:

2          In Kevin Freeman, for instance, we held that once the
       government established a foundation, a police officer could
3      provide lay witness opinion testimony regarding the meaning
       of statements in the defendant's intercepted phone calls
4      because the testimony was based on the officer's "direct
       perception of several hours of intercepted conversations—in
5      some instances coupled with direct observation of [the
       defendants]—and other facts he learned during the
6      investigation." 498 F.3d at 904-05; see also United States
       v. El-Mezain, 664 F.3d 467, 513-14 (5th Cir. 2011)
7      (allowing lay opinion testimony interpreting telephone
       calls when "the agents' opinions were limited to their
8      personal perceptions from their investigation of this
       case"); United States v. Rollins, 544 F.3d 820, 830-33 (7th
9      Cir. 2008) (finding no error in the district court's
       decision to allow the agent's testimony regarding his
10     "impressions" of recorded conversations when the testimony
       was "based on the agent's perceptions derived from the
11     investigation of this particular conspiracy").

12     Id at 34-35.

13         Such testimony is admissible even if the testifying officer was

14     not a participant in the recorded conversation. Kevin Freeman, 498

15     F.3d at 904; see also United States v. Jayyousi, 657 F.3d 1085, 1102

16     (11th Cir. 2011) (holding that a lay witness's testimony was

17     admissible even though "he did not personally observe or participate

18     in the defendants' conversations").  Here, SA Easter and TFO Marquez

19     were personally monitoring each of the recorded meets involving

20     defendant, often times while contemporaneously surveilling him.

21         The reason such law enforcement testimony is regularly admitted

22     in criminal trials is because it serves an important jury function.

23         Lay witness testimony regarding the meaning of ambiguous
       conversations based on the witness's direct perceptions and
24     experience may also prove "helpful to the jury" for
       purposes of Rule 701. See Kevin Freeman, 498 F.3d at 904-05
25     (agent's "understanding of ambiguous phrases" based on the
       "direct perception of several hours of intercepted
26     conversations" along with "direct observation" of
       defendants and "other facts he learned during the
27     investigation" resulted in testimony that "proved helpful
       to the jury in determining what the [co-conspirators] were
28     communicating during the recorded telephone calls"); see

                                14

1
2
3

<u>also Rollins</u>, 544 F.3d at 832-33 (agent's testimony based on listening to every intercepted conversation, and other "personal observations and perceptions" related to the specific case at issue "assisted the jury in determining several facts in issue").

4 <u>Gadson</u>, 2014 U.S. App. LEXIS 15969, at 35-36.  Similarly here, SA

5 Easter and TFO Marquez personally participated in basically every

6 significant investigative step in this case, which included listening

7 to essentially every recording and being physically present at each

8 significant event.  As such, the Circuit well supports their

9 testimony whereby they will employ their significant knowledge of the

10 case to help the jury navigate and interpret the sometimes complex,

11 concealed, or just confusing recordings in this case.[7]

12 **C.   Dubious or Self-Serving Exculpatory Statements by the Defendant Are Inadmissible**

13
14 On certain recordings, defendant feigns inexperience with

15 certain aspects of his illegal conduct.  For example, on a few

16 occasions defendant contends, despite being able to regularly supply

17 and properly price significant firearms for sale, that selling

18 firearms is "not [his] thing" or, later, he contends that he is "not

19 greedy."  Such self-serving (slightly) exculpatory statements by

20
21 [7] Courts have admitted opinion testimony by law enforcement agents on a number of other issues too, such as (1) the modus operandi of drug traffickers, <u>United States v. Espinosa</u>, 827 F.2d 604, 612 (9th Cir. 1987) (holding that district court properly admitted law enforcement officer's expert testimony expert on the modus operandi of narcotics traffickers, including use of "stash pads" for drugs); (2) the use of guns by drug traffickers, <u>United States v. Perez</u>, 116 F.3d 840, 848 (9th Cir. 1997); and (3) a defendant's apparent attempt to avoid surveillance, <u>United States v. Andersson</u>, 813 F.2d 1450, 1458 (9th Cir. 1987).  An experienced narcotics agent's opinion testimony may be based in part on information from other agents familiar with the issue.  <u>United States v. Beltran-Rios</u>, 878 F.2d 1208, 1213 n.3 (9th Cir. 1989).

22
23
24
25
26
27
28

15

1  defendant are inadmissible hearsay.  See <u>United States v. Waters</u>, 627

2  F.3d 345, 385 (9th Cir. 2010) (holding that defendant's exculpatory

3  statement proclaiming innocence "is clearly hearsay, and was

4  therefore properly excluded under Rule 801(a)"); <u>United States v.</u>

5  <u>Ortega</u>, 203 F.3d 675, 682 (9th Cir. 2000) (holding that district

6  court did not commit error by prohibiting defendant from cross-

7  examining government witness concerning false exculpatory statements

8  made during the same interview in which defendant made inculpatory

9  statements).

10       D.   **Recorded Conversations**

11       At trial, the government expects to introduce approximately 30

12  recordings.  Many of the recordings are lengthy, so the government

13  has made clips of the most pertinent parts.  Each recording has been

14  produced to the defense and has been placed onto compact discs, which

15  the government will offer as exhibits (500-505) at trial.

16       All duly admitted recorded conversations must be played in open

17  court.[8]  The foundation that must be laid for the introduction into

18  evidence of recorded conversations is a matter largely within the

19  discretion of the trial court.  There is no rigid set of foundational

20  requirements.  Rather, the Ninth Circuit has held that recordings are

21  sufficiently authenticated under Federal Rule of Evidence 901(a) if

22  sufficient proof has been introduced "so that a reasonable juror

23  could find in favor of authenticity or identification," which can be

24  done by "proving a connection between the evidence and the party

---

25       [8] Allowing jurors to take into the jury deliberation room
26  recorded conversations that were not played in open court is
    structural error requiring automatic reversal if a defendant objects
27  to allowing the jurors to have the un-played recordings in the jury
    room.  <u>United States v. Noushfar</u>, 78 F.3d 1442, 1444-45 (9th Cir.
28  1996).

against whom the evidence is admitted" and can be done by both direct and circumstantial evidence.  United States v. Matta-Ballesteros, 71 F.3d 754, 768 (9th Cir. 1995), modified by 98 F.3d 1100 (9th Cir. 1996).

Witnesses may testify competently as to the identification of a voice on a recording.  A witness's opinion testimony in this regard may be based upon his having heard the voice on another occasion under circumstances connecting it with the alleged speaker.  Fed. R. Evid. 901(b)(5); United States v. Torres, 908 F.2d 1417, 1425 (9th Cir. 1990) ("Testimony of voice recognition constitutes sufficient authentication.").  In this case, the government expects that SA Easter and TFO Marquez will authenticate the voices heard and persons seen on the recordings because they heard them on the day they were recorded, have direct personal knowledge of the persons on the recordings, and thus can identify both the visual person and the audio.

Recorded conversations are competent evidence even when they are partly inaudible, unless the unintelligible portions are so substantial as to render the recording as a whole untrustworthy. United States v. Rrapi, 175 F.3d 742, 746 (9th Cir. 1999).  Here, for each recording at least one witness (many times multiple witnesses) have reviewed and authenticated the audio (and video where applicable).

### E.   Charts and Summaries

The government will use charts and summaries in order to streamline its case-in-chief and provide an aid to the jury.  Under FRE 1006, the Court may admit summaries into evidence where those summaries are based on voluminous, already-admitted exhibits.  See,

e.g. United States v. Anekwu, 695 F.3d 967 (9th Cir. 2012) (while
noting that "we do not approve of receiving summary exhibits of
material already in evidence, we have not reversed for that reason .
. . . [with limiting instructions and the opportunity to cross-examine
the agent who prepared the summaries], we cannot conclude that the
district court abused its discretion in admitting both the summary
chart and underlying records into evidence") (internal citations and
quotations omitted); see also United States v. Rizk, 660 F.3d 1125,
1130-31 (9th Cir. 2011) (finding that district court did not abuse
discretion in admitting summary charts of admissible (though not
admitted) material, since "Rule 1006 permits admission of summaries
based on voluminous records that cannot readily be presented in
evidence to a jury and comprehended"); see also United States v.
Boulware, 470 F.3d 931, 936 (9th Cir. 2006) (upholding district
court's decision to admit summary chart of already-admitted evidence
where district court "no doubt believed that it would be helpful to
have the voluminous financial materials reduced to summary form").

   The government will seek to admit the following types of summary
charts into evidence in this case: (i) a summary of the drugs seized
in this case; (ii) a summary of the firearms seized in this case;
(iii) a summary of the money defendant made in his sales; and (iv) a
summary of the associates in defendant's enterprise

   Because there will be multiple individuals discussed and
identified throughout trial the government requests the use
of a large poster-board sized chart of referenced-participants in
defendant's enterprise that the jury can see throughout the trial.
See, e.g. United States v. Yeley-Davis, 632 F.3d 673, 685 (10th Cir.
2011) (approving use of "photo-arrays of the individuals alleged to

18

be a part of the conspiracy"; district court's admission of chart was proper in part because court offered limiting instruction that the chart did not "prove any elements of the crimes charged"). [9] The government believes that this exhibit will be particularly helpful for the jury during any testimony that implicates the co-conspirators, each of whom has their own true name, gang moniker, nicknames, and variations of each.  In other words, such a face sheet will enable the jury (and the Court and the parties) to better follow the narrative of the testimony and the role of each person discussed. The government believes that such a chart will significantly aid the jury and provide context for the case, and can be limited by an appropriate instruction at the time of its admission indicating that such a chart is evidence but is not, standing alone, conclusive of any element.

### F.    Co-Conspirator Statements

Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may be used against another conspirator because such declarations are not hearsay.  See Fed. R. Evid. 801(d)(2)(E).  Further, statements made in furtherance of a conspiracy were expressly held by the Supreme Court in Crawford v. Washington, 541 U.S. 36, 56 (2004) to be "not testimonial" such that their admission does not violate the Confrontation Clause.  As such, the admission of co-conspirator statements pursuant to Fed. R. Evid.

---

[9] In late 2012, in United States v. Rafael Munoz-Gonzalez, et al., CR 10-567-AHM, the Honorable Judge Matz (retired), **ordered** the undersigned that the government develop and display such a chart and admit it as a **Court** exhibit at the start of the trial.  Judge Matz directed the use of such a chart in order for the jury, the court, and the parties to better keep track of the testimony throughout the proceeding.

1   801(d)(2)(E) requires only a foundation that: (1) the declaration was
2   made during the life of the conspiracy; (2) it was made in
3   furtherance of the conspiracy; and (3) there is, including the co-
4   conspirator's declaration itself, sufficient proof of the existence
5   of the conspiracy and of the defendant's connection to it.  See
6   Bourjaily v. United States, 483 U.S. 171, 173, 181 (1987).
7   Circumstantial evidence is sufficient to establish the existence of a
8   conspiracy.  United States v. Weaver, 594 F.2d 1272, 1274 (9th Cir.
9   1979).  "Once the conspiracy has been proven under these standards,
10  only 'slight evidence' is necessary to connect a coconspirator to the
11  conspiracy."  United States v. Perez, 658 F.2d 654, 658 (9th Cir.
12  1981) (quoting Weaver, 594 F.2d at 1274).

13      The government must prove by a preponderance of the evidence
14  that a statement is a co-conspirator declaration in order for the
15  statement to be admissible under Rule 801(d)(2)(E).  Bourjaily, 483
16  U.S. at 176; United States v. Crespo de Llano, 838 F.2d 1006, 1017
17  (9th Cir. 1987).  Whether the government has met its burden is to be
18  determined by the trial judge, and not the jury.  United States v.
19  Zavala-Serra, 853 F.2d 1512, 1514 (9th Cir. 1988).  The Court may
20  rely on inadmissible evidence, such as a co-conspirator's plea
21  agreement, in determining whether the 801(d)(2)(E) exception applies.
22  Cf. United States v. Gil, 58 F.3d 1414, 1420 (9th Cir. 1995) (the
23  preliminary determination of whether FRE 801(d)(2)(E) applies is to
24  be made "by the court, not the jury, pursuant to Fed. R. Evid.
25  104(a)); Fed. R. Evid. 104(a) ("the court must decide any preliminary
26  question about whether . . . evidence is admissible.  In so deciding,
27  the court is not bound by evidence rules, except those on
28  privilege").

1    The trial court has discretion to determine whether the

2    government may introduce co-conspirator declarations before

3    establishing the conspiracy and the defendant's connection to it.

4    United States v. Loya, 807 F.2d 1483, 1490 (9th Cir. 1987).  It also

5    has the discretion to vary the order of proof in admitting a co-

6    conspirator's statement.  Id.  The court may allow the government to

7    introduce co-conspirator declarations before laying the required

8    foundation under the condition that the declarations will be stricken

9    if the government fails ultimately to establish by independent

10   evidence that the defendant was connected to the conspiracy.  Id.;

11   United States v. Spawr Optical Research, Inc., 685 F.2d 1076, 1083

12   (9th Cir. 1982); Fleishman, 684 F.2d at 1338.

13   To be admissible under Federal Rule of Evidence 801(d)(2)(E) as

14   a statement made by a co-conspirator in furtherance of the

15   conspiracy, a statement must "further the common objectives of the

16   conspiracy," or "set in motion transactions that [are] an integral

17   part of the [conspiracy]." United States v. Arambula-Ruiz, 987 F.2d

18   599, 607-08 (9th Cir. 1993); United States v. Yarbrough, 852 F.2d

19   1522, 1535 (9th Cir. 1988).  Such statements are admissible whether

20   or not they actually result in any benefit to the conspiracy.

21   Williams, 989 F.2d at 1068; United States v. Schmit, 881 F.2d 608,

22   612 (9th Cir. 1989).  Thus, co-conspirator declarations need not be

23   made to a member of the conspiracy to be admissible under Rule

24   810(d)(2)(E) and can be made to government informants and undercover

25   agents.  Zavala-Serra, 853 F.2d at 1516 (statements to informants and

26   undercover agents); United States v. Tille, 729 F.2d 615, 620 (9th

27   Cir. 1984) (statements to informants); United States v. Echeverry,

28   759 F.2d 1451, 1457 (9th Cir. 1985) (statements to undercover agent).

Declarations of an unindicted co-conspirator made in furtherance of the conspiracy may be used against a charged conspirator.  See United States v. Nixon, 418 U.S. 683, 701 (1974); United States v. Williams, 989 F.2d 1061, 1067 (9th Cir. 1993).

Courts have interpreted the "in furtherance of" requirement broadly and have considered, among others, the following co-conspirator declarations as being made "in furtherance of the conspiracy":

1.   statements made to induce enlistment in the conspiracy (United States v. Arias-Villanueva, 998 F.2d 1491, 1502 (9th Cir. 1993));

2.   statements made to keep a conspirator abreast of a co-conspirator's activity, to induce continued participation in a conspiracy, or to allay the fears of a co-conspirator (Arias-Villanueva, 998 F.2d at 1502); see also United States v. Ammar, 714 F.2d 238, 252 (3d Cir. 1983) ("[s]tatements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy further the ends of the conspiracy . . . .");

3.   statements made to prompt action in furtherance of the conspiracy by either of the participants to the conversation (United States v. Layton, 720 F.2d 548, 556 (9th Cir. 1983));

4.   statements related to the concealment of the criminal enterprise (Tille, 729 F.2d at 620); Garlington v. O'Leary, 879 F.2d 277, 283 (7th Cir. 1989));

5.   statements seeking to control damage to an ongoing conspiracy (Garlington, 879 F.2d at 283);

6.   statements made to reassure members of the conspiracy's continued existence (Yarbrough, 852 F.2d at 1535);

22

1   7. statements by a person involved in the conspiracy to induce

2 a buyer's purchase of contraband by assuring the buyer of the

3 person's ability to consummate the transaction (Echeverry, 759 F.2d

4 at 1457);

5   8. statement identifying another co-conspirator as source for

6 the contraband to be sold to purchaser (Lechuga, 888 F.2d at 1480);

7   9. "bragging," boasts and other conversation designed to

8 obtain the confidence, or allay the suspicions, of another

9 conspirator (or apparent conspirator who actually was an undercover

10 agent)(United States v. Santiago, 837 F.2d 1545, 1549 (11th Cir.

11 1988); Lechuga, 888 F.2d at 1480; United States v. Miller, 664 F.2d

12 94, 98 (5th Cir. 1981)); and

13   10. statements that refer to another conspirator as the boss,

14 the overseer, or sir (United States v. Barnes, 604 F.2d 121, 157 (2d

15 Cir. 1979)).

16  **G.** **Photographs**

17  The government intends to introduce dozens of photographs taken

18 from the various meetings, search warrants, and seized items.

19 Photographs may be authenticated by a witness who "identif[ies] the

20 scene itself [in the photograph] and its coordinates in time and

21 place." See Lucero v. Stewart, 892 F.2d 52, 55 (9th Cir. 1989)

22 (internal quotation marks omitted). Photographs are generally

23 admissible as evidence. See United States v. Stearns, 550 F.2d 1167,

24 1171 (9th Cir. 1977) (photographs of crime scene admissible).

25 Photographs should be admitted so long as they fairly and accurately

26 represent the event or object in question. United States v. Oaxaca,

27 569 F.2d 518, 525 (9th Cir. 1978). Also, "[p]hotographs are

28 admissible as substantive as well as illustrative evidence." United

23

1  States v. May, 622 F.2d 1000, 1007 (9th Cir. 1980).

2  **H.  Defendant's Membership in the Colonia Chiques Criminal
   Street Gang and Association with the Mexican Mafia Prison**

3  **Gang Has Been Ruled Admissible by the Court**

4        As stated above, the Court has found that limited testimony

5  regarding defendant's leadership in the Colonia Chiques criminal

6  street gang and status as a Mexican Mafia associate is admissible.

7  (CR 246). The Ninth Circuit supports admission of gang evidence where

8  it is relevant to an element of the offense and/or introduced for a

9  permissible purpose.  See United States v. Santiago, 46 F.3d 885, 889

10 (9th Cir. 1995) (gang evidence permissibly admitted to establish

11 motive and "to show how and why other inmates assisted [defendant]"

12 in the crime); see also United States v. Major, 676 F.3d 803, 810

13 (9th Cir. 2012) (holding that the district court did not abuse its

14 discretion in admitting gang affiliation evidence as relevant to

15 motive); see also  United States v. Hankey, 203 F.3d 1160, 1171-72

16 (9th Cir. 2000) (evidence that defendant and defense witness were

17 members of same gang was properly admitted to show bias).  However,

18 as noticed to defendant, beyond defendant's role and status, the

19 government does not intend to admit any extrinsic or expert evidence

20 of defendant committing specific acts of violence or Mexican Mafia

21 conduct that occurred prior (or subsequent) to the investigation in

22 this case.  However, if defendant "opens the door" to such

23 questioning, either during his cross-examination of the government's

24 witnesses, or during defendant's case-in-chief, by challenging the

25 findings of the experts that defendant is a Colonia Chiques member

26 and Mexican Mafia associate the government will introduce supporting

27 testimony regarding these findings of defendant's gang life.

28

1        **I.   Evidence of Prior Incarceration**

2            The government's case-in-chief requires that the government

3    present limited evidence that defendant has experienced previous

4    periods of incarceration.  This evidence will be limited in that it

5    will not seek to detail any of the underlying facts which led to a

6    particular period(s) of incarceration or for how long defendant was

7    incarcerated.  Instead, this evidence will come in the following

8    formats. First, defendant himself references his prior incarceration

9    in several conversations during the charged transactions in this case

10   in order to explain his own status within his criminal street gang;

11   his criminal associations; and to prove his link to a powerful prison

12   gang "that goes all the way to the federal penitentiary and runs all

13   the" Southern California criminal street gangs.  See <u>United States v.</u>

14   <u>Soliman</u>, 813 F.2d 277, 279 (9th Cir. 1987) (holding that evidence

15   should not be treated as "other crimes" evidence when "the evidence

16   concerning the "other act[s]" and the evidence concerning the crime

17   charged are inextricably intertwined.")  In addition, limited

18   evidence of defendant's prior prison term(s) are material to proof of

19   his membership, status, and activity as a validated Mexican Mafia

20   associate because it was the CDCR prison agency that validated him.

21   <u>United States v. Taylor</u>, 17 F.3d 333, 339 (11th Cir. 1994)).  Third,

22   defendant is charged with multiple counts of being a felon in

23   possession of a firearm.  An element of that crime requires the

24   government prove defendant was convicted of a felony.  Thus, it will

25   not so shock the jury to learn that defendant has served prison time

26   that they cannot render a fair verdict based on the evidence.

27

28

1    Accordingly, introduction of this basic fact is not unduly

2    prejudicial and is inextricably intertwined in the charged offenses.[10]

3        **J.   Authentication and Identification/Chain of Custody**

4        The government will seek to introduce physical evidence

5    recovered from the various crime scenes.  Federal Rule of Evidence

6    901(a) provides that "[t]o satisfy the requirement of authenticating

7    or identifying an item of evidence, the proponent must provide

8    evidence sufficient to support a finding that the item is what the

9    proponent claims it is."  Accordingly, under Rule 901, issues of

10   authenticity and identification are treated as "a special aspect of

11   relevancy."  Fed. R. Evid. 901(a) (Advisory Committee Notes).

12       Rule 901(a) only requires the government to make a <u>prima facie</u>

13   showing of authenticity or identification "so that a reasonable juror

14   could find in favor of authenticity or identification."  <u>United</u>

15   <u>States v. Chu Kong Yin</u>, 935 F.2d 990, 996 (9th Cir. 1991) (quoting

16   <u>United States v. Blackwood</u>, 878 F.2d 1200, 1202 (9th Cir. 1989) (per

17   curiam)).  The authenticity of proposed exhibits may be proven by

18   circumstantial evidence.  <u>See</u> <u>United States v. King</u>, 472 F.2d 1, 9–11

19   (9th Cir. 1972).  If the government makes a <u>prima facie</u> showing of

20   authenticity, the Court should admit the evidence.  <u>See</u> <u>United States</u>

21   <u>v. Black</u>, 767 F.2d 1334, 1342 (9th Cir. 1985).  The credibility or

22   probative force of the evidence offered is ultimately an issue for

23   the trier of fact.  <u>Chu Kong Yin</u>, 935 F.2d at 996 (internal quotation

24   marks omitted).

25   _____

26       [10] Although, the government was not able to locate a Ninth
     Circuit case directly only point, the reasoning in an unpublished
     decision provided guidance.  <u>United States v. Lizalde</u> follows the
27   lead of several Circuit Courts in allowing prior incarceration
     evidence when it is necessary to complete the prosecution's
28   narrative.  <u>United States v. Lizalde</u>, 21 F.3d 1117 (9th Cir. 1994).

1   To be admitted into evidence, a physical exhibit must be in
2   substantially the same condition as when the crime was committed.
3   Fed. R. Evid. 901.  The Court may admit the evidence if there is a
4   "reasonable probability the article has not been changed in important
5   respects."  United States v. Harrington, 923 F.2d 1371, 1374 (9th
6   Cir. 1991) (quoting Gallego v. United States, 276 F.2d 914, 917 (9th
7   Cir. 1960)).  This determination is to be made by the trial judge and
8   will not be overturned except for clear abuse of discretion.  Factors
9   the Court may consider in making this determination include the
10  nature of the item, the circumstances surrounding its preservation,
11  and the likelihood of intermeddlers having tampered with it.
12  Gallego, 276 F.2d at 917.

13  In establishing chain of custody as to an item of physical
14  evidence, the government is not required to call all persons who may
15  have come into contact with the piece of evidence.  Harrington, 923
16  F.2d at 1374.  Moreover, a presumption of regularity exists in the
17  handling of exhibits by public officials.  Id.  Therefore, to the
18  extent that alleged or actual gaps in the chain of custody exist,
19  such gaps go to the weight of the evidence rather than to its
20  admissibility.  Id.

21  **K.    The Court May Answer Jury Questions with Specific**
        **References to Particular Jury Instructions**
22
23  Under the law of this circuit, "[t]he necessity, extent and
24  character of additional instructions are matters within the sound
25  discretion of the trial court."  United States v. Collom, 614 F.2d
26  624, 631 (9th Cir. 1979) (citations omitted).  However, the district
27  court has an obligation, when a jury requests clarification on an
28  issue, to "clear away the confusion 'with concrete accuracy.'"

27

1    United States v. McCall, 592 F.2d 1066, 1068 (9th Cir. 1979) (quoting

2    Bollenbach v. United States, 326 U.S. 607, 612-13 (1946).  In some

3    circumstances, this may require giving a supplementary jury

4    instruction.  United States v. McIver, 186 F.3d 1119, 1130 (9th Cir.

5    1999) ("By asking 'what is manufacturing?' the jury clearly indicated

6    its confusion on this issue. The district court correctly decided

7    that the jury instructions were inadequate without a definition of

8    manufacturing. Rather than 'confusing the jury' by giving the

9    instruction, as [defendants] contend, the district court judge was

10   eliminating confusion, as required by McCall.")

11        Thus, the district court may provide specific answers to a

12   jury's questions when the jury has "ma[de] explicit its difficulties

13   [with the law]."  United States v. Frega, 179 F.3d 793, 809 (9th Cir.

14   1999).  Where the jury has shown such confusion, a general response

15   that simply directs the jury to the court's instructions can be

16   deemed confusing and misleading.  Id. at 810.  (district court

17   committed error where it responded to a jury question by "telling the

18   jury that it could consider 'all of the evidence that [it had] heard

19   or seen during the trial . . . as to all counts'").  Thus, upon a

20   showing of confusion the Court may direct jurors to specific jury

21   instructions and/or may provide supplemental instructions, provided

22   neither are incorrect statements of the law.  McIver, 186 F.3d at

23   1131 (No plain error because "the supplemental instruction consisted

24   of a correct statement of law. The court merely defined a term used

25   in the original charge to the jury, and the instruction was essential

26   to clear up the jury's confusion.")

27        L.   **Reciprocal Discovery**

28        Despite the government's requests, defendant has not produced

28

any reciprocal discovery to the government.  Accordingly, to the extent that there exists reciprocal discovery to which the government is entitled under Federal Rules of Criminal Procedure 12.1, 12.2, 16(b), or 26.2 that defendant has not produced, the government reserves the right to seek to have such materials excluded at trial. See United States v. Young, 248 F.3d 260, 269-70 (4th Cir. 2001) (upholding exclusion under Rule 16 of audiotape evidence defendant did not produce in pretrial discovery where defendant sought to introduce audiotape on cross-examination of government witness not for impeachment purposes, but as substantive "evidence in chief" that someone else committed the crime).

Dated: August 28, 2014          Respectfully submitted,

                                STEPHANIE YONEKURA
                                Acting United States Attorney

                                ROBERT E. DUGDALE
                                Assistant United States Attorney
                                Chief, Criminal Division


                                     /s/
                                _____
                                MACK E. JENKINS
                                CAMERON L. SCHROEDER
                                Assistant United States Attorneys

                                Attorneys for Plaintiff
                                UNITED STATES OF AMERICA